**In re JEWISH MEMORIAL HOSPITAL, Debtor.**

**Bankruptcy No. 77 B 2575.**

United States Bankruptcy Court, S. D. New York.

Aug. 26, 1981.

Levin & Weintraub, New York City, for debtor; Harris Levin, Mitchel H. Perkiel, New York City, of counsel.

Sipser, Weinstock, Harper, Dorn & Leibowitz, New York City, for creditors; Donald E. Klein, New York City, of counsel.

## MOTION FOR ORDER DIRECTING DEBTOR TO MAKE PAYMENTS DUE TO EMPLOYEE BENEFIT PROGRAMS

BURTON R. LIFLAND, Bankruptcy Judge.

On October 18, 1977, Jewish Memorial Hospital ("J.M.H.") filed a petition for an arrangement under Chapter XI of the Bankruptcy Act [1] and was thereafter authorized to continue in the management and control of its operation and property as a debtor in possession.

J.M.H. is a voluntary, not-for-profit hospital with an annual budget in excess of $14 million, employing approximately 550 employees, maintaining approximately 200 beds, and engaging approximately 250 attending physicians. It provides hospital health care services for a widespread geographic area in upper Manhattan accommodating approximately 54,000 clinic visits and 20,000 emergency ward visits each year.

At the commencement of this proceeding, J.M.H. was one of two other hospitals that provided essential health care to the area. Recently, one of these hospitals was permanently closed. Various elected public officials and interested parties, and employee representatives, have asserted that this recent closing, plus the surcease of J.M.H., would create a health crisis affecting hundreds of thousands of area residents. (May 22, 1981 transcript at 46, August 14, 1981 transcript at ——) They explain that the remaining area hospital (Columbia Presbyterian Hospital) is not able to fill the void and absorb the patient transfers that would be necessitated by the closing of J.M.H.

Both prior and subsequent to the commencement of the Chapter XI case, J.M.H. maintained an ongoing relationship with the National Pension Fund for Hospital and Health Care Employees, National Benefit Fund for Hospital and Health Care Employees, National Benefit Fund for Hospital and Health Care Employees and Hospital League District 1199 Training and Upgrading Fund ("District 1199"), incident to which J.M.H. made monthly contributions of funds earmarked for health, welfare and other employee benefit programs. In or about the Fall of 1979, as a result of an inadequate cash flow, J.M.H. was unable to continue funding what it regarded as "non-essential services", and ceased making contributions to District 1199's employee benefit program. J.M.H., exercising selective judgment, continued to use available husbanded resources to fund necessary ongoing services and make currently needed purchases. (January 20, 1980 transcript at 15–16, May 22, 1981 transcript at 25–32). The hospital provides free medical services to its employees otherwise covered under the union health plan.

J.M.H., sensitive to its relation with its District 1199 employees, made at the beginning of this year a voluntary offer (with the approbation of the court) to make best effort partial payments of $10,000 per month. This offer was refused by District 1199 at several stages of the proceeding (requesting all or nothing). On June 23, 1981, District 1199 (claiming to represent the "funds" as distinguished from representation of the union members) renewed its motion made previously,[2] for an order directing J.M.H. to make immediate and full payments due under the collective bargaining agreement despite recognition that the relief was tantamount to closing the hospital. Though other administration debt was accruing, no other creditor joined in the request.

---

1. Although the 1978 Code was enacted on November 6, 1978 and became effective on October 1, 1979 (Section 402(a) of Title IV), those cases commenced under the 1898 Act (repealed by Section 401(a)) are conducted and determined by that law. Section 403(a) of Title IV of the 1978 bankruptcy reform legislation, 92 Stat. 2549, 2683.

2. This case was originally assigned to Bankruptcy Judge Lesser, now retired, and thereafter to Bankruptcy Judge Galgay. While the case was pending before Judge Galgay the motion was carried without disposition. The case was next referred to me as successor to Judge Lesser, and the motion was carried and intermittently pressed by District 1199.

■ The court, having considered the merits of District 1199's motion at great length, concludes that to direct full and immediate payment of the total accrued debt (some $1,072,547.94 excluding interest through the month of May) (July 2, 1981 transcript at 12) would be inappropriate under the facts herein presented. So much of the motion as requests full and immediate payment is denied.

District 1199's demand for rigid application of its right to payment as an ongoing administration expense creditor raises more than a simple question as to the operation of the priority ranking scheme contained in Section 64(a)(1) of the Bankruptcy Act, and is in fact a challenge to the court's inherent power to do equity.

■ It is well established that the Bankruptcy Court is a court of equity and that its proceedings are inherently proceedings in equity. *See Young v. Higbee Co.*, 324 U.S. 204, 214, 65 S.Ct. 594, 599, 89 L.Ed. 890 (1945); *Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939); *Local Loan Co. v. Hunt*, 292 U.S. 234, 240, 54 S.Ct. 695, 697, 78 L.Ed. 1230 (1934); 28 U.S.C. 1481. "[T]he Bankruptcy Court has the power to sift the circumstances surrounding any claim to see that injustice and unfairness is not done in the administration of the bankrupt estate." *Pepper v. Litton, supra* 308 U.S. at 308, 60 S.Ct. at 246.[3]

■ It is equally well settled that a court of equity, exercising its discretion, may refuse specific enforcement of a valid individual right if the granting of such a right would be prejudicial to a paramount public interest. *Commonwealth of Penn v. Williams*, 294 U.S. 176, 55 S.Ct. 380, 79 L.Ed. 841 (1935); *United States v. Dern*, 289 U.S. 352, 53 S.Ct. 614, 77 L.Ed. 1250 (1933); *City of Harrisonville v. Dickey Clay Mfg. Co.*, 289 U.S. 334, 53 S.Ct. 602, 77 L.Ed. 1208 (1933); *Duncan Townsite Co. v. Lane*, 245 U.S. 308, 38 S.Ct. 99, 62 L.Ed. 309 (1917). The health and safety of the general public is undisputably a paramount public interest. *Seaboard Air Line R. Co. v. Atlanta, B. & C.R. Co.*, 35 F.2d 609 (5th Cir. 1929). The *Seaboard* court further explained that a court of equity may refuse specific performance of a valid contract, where compliance with the provisions of the contract would force a public service provider [there a railroad] to divert funds from the maintenance of its facilities. The court reasoned thusly:

[T]he financial condition of the appellee is such that a probable result of requiring it to make the expenditures necessary for a compliance with the demand sought to be enforced would be to disable it from performing its duties to the public, including its duty to keep its tracks and equipment in reasonably safe condition. It well may be considered that the interest of the public served by appellee's line, in its tracks, roadbed, and equipment being maintained in reasonably safe condition, is paramount to the interest of the appellant.... We think that in the circumstances disclosed there was warrant for the inference that a paramount public

---

3. The United States Supreme Court has described the workings of a Court of Equity as follows:

In shaping equity decrees, the trial court is vested with broad discretionary power; appellate review is correspondingly narrow. *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 15, 27 n. 10, 91 S.Ct. 1267, 1275, 1281, 28 L.Ed.2d 554 (1971). Moreover, in constitutional adjudication as elsewhere, *equitable remedies are a special blend of what is necessary*, [footnote omitted] *what is fair, and what is workable. "Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs." Brown v. Board of Education*, 349 U.S. 294,

300, 75 S.Ct. 753, 756, 99 L.Ed. 1083 (1955). Mr. Justice Douglas, speaking for the Court, has said,

"The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mold each decree to the necessities of the particular case. *Flexibility rather than rigidity has distinguished it.* The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims." *Hecht Co. v. Bowles*, 321 U.S. 321, 329–330, 64 S.Ct. 587, 592, 88 L.Ed. 754 (1944).

*In re Parr*, 1 B.R. 453 (Bkrtcy.E.D.N.Y.1979).

interest might be interfered with by granting the relief sought. This being so, the court's refusal to grant that relief was not reversible error.

35 F.2d at 610–611.

While the obligations due District 1199 falls under the same category of Section 64(a)(1) priority payments as the expenses that J.M.H. is currently paying (i. e. costs and expenses of administration of the estate) and though there are cases holding that the court may not establish priorities within priorities, there is also a line of authority that holds that the Bankruptcy Act does not establish inexorable rules for distribution that can never be deviated from in the interest of justice and equity. *See Home Indemnity Co. v. F. H. Donovan Painting Co.*, 325 F.2d 870 (8th Cir. 1963); *In the Matter of Reading Co.*, 439 F.Supp. 389 (E.D.Pa.1977); *In re Penn Central Transportation Co.*, 325 F.Supp. 294 (E.D. Pa.1970); *In re Jeffrey Leory Weihl*, 2 C.B. C.2d 270 (Bkrtcy.S.D.Ohio 1979). Given the nature of this case, the court adopts this latter line of cases. If ever there were circumstances where the paramount public interest would be prejudiced by a private interest, they are to be found in this case.

District 1199 concedes that granting the requested relief will necessitate the closing of the hospital (July 2, 1981 transcript at 12), yet they press on. In defense of this position, District 1199 asserts that its obligation to the pension fund and its beneficiaries is its primary interest. (July 2, 1981 transcript at 11–12) This crabbed reasoning is difficult to comprehend. Jettisoned along with the patient occupants will be the employees whose livelihood is linked to the hospital (inclusive of District 1199 employees). It has been asserted by the debtor, with the concurrence of the creditors committee, that in view of the debt structure there will be little likelihood of recovery of administration or pre-petition debts in the event of closure and the ensuing adjudication in bankruptcy. It has been urged upon this court that the only possibility of rehabilitation of this hospital facility is public or private funding obtainable only while the

hospital is functioning and providing its essential services. The debtor, with the concurrence of the other creditor and community interests, urges that it be given an additional reasonable period of time to obtain public or private financing to keep its doors open and fund an arrangement. While the debtor's optimism may be misplaced and illusory, the dispassionate concerns deserving of the ordinary failing business enterprise are just not applicable to this hospital.

In *Clawson Medical Rehabilitation*, 7 B.C.D. 295, 4 C.B.C.2d 73, 9 B.R. 644 (Bkrtcy.E.D.Mich.1981), the court pointed out that the forced closing of a facility similar to J.M.H., no matter how temporary such a closing, would probably be the facility's death knell. Specifically, the court stated that:

> The loss of goodwill and other intangibles and tangible benefits of ongoing business value will reduce the amounts available to satisfy claims. . . . The difficulties of reviving a business which is not in operation may result in a failed reorganization followed by liquidation. . . . Liquidation will substantially reduce the amount realized by all claimants. . . . It therefore appears that unless the debtor remains in operation it and other interested parties will be irreparably harmed. [citation omitted]

7 B.C.D. at 299, 4 C.B.C.2d at 81, 9 B.R. at 650.

In other words, killing the patient to cure the disease is not the solution. Further and more importantly, it is clear that the applicant is not rendering services essential to the debtor's existence. In contrast, the hospital is providing services that are essential and which cannot be replaced. A balancing of the equities in this case mandates that full payment to District 1199 be deferred at least for the present. This court will not gamble with the health and well being of the community for the questionable benefit of District 1199. J.M.H., sensitive to its relation with its employees, does not dispute its obligation to District 1199 for the full amount sought, only its present ability to pay in full is questioned.

The court therefore follows the principles of flexibility set forth in the *Home Indemnity* line of cases cited above and not for the purpose of establishing a ranking of priorities within priorities. Accordingly, the motion of District 1199 for payment of its accruing expense claim is granted to the extent that the debtor is directed to make payments to this creditor on an ongoing basis out of those funds available to it after payment of essential, necessary expenses of operation. Such payments shall be without prejudice to review in the future should circumstances warrant.

So Ordered.