In re IONOSPHERE CLUBS, INC., and Eastern Air Lines, Inc., Debtors.

Bankruptcy Nos. 89 B 10448 (BRL), 89 B 10449 (BRL).

United States Bankruptcy Court, S.D. New York.

March 23, 1989.

Weil, Gotshal & Manges, New York City (Harvey R. Miller, Richard P. Krasnow, Bruce R. Zirinsky, Zack A. Clement, of counsel), for debtors.

Kramer, Levin, Nessen, Namin & Frankel, New York City (Joel B. Zweibel, of counsel), for Official Creditors Committee.

Cravath, Swaine & Moore, New York City (David Boies, of counsel), for Texas Air Corp.

Guerrieri, Edmond & James, P.C. (Robert S. Clayman, of counsel), Zuckerman, Spaeder, Goldstein, Taylor & Kolker, Washington, D.C. (Stephen E. Leach, of counsel), for Intern. Ass'n of Machinists.

O'Donnell & Schwartz, New York City (Malcolm A. Goldstein, of counsel), for Transport Workers Union of America.

Cohen Weiss and Simon, New York City (Bruce H. Simon, Richard M. Seltzer, of counsel), for Airline Pilots Ass'n.

## RULING ON NECESSITY FOR PAYMENT OF CERTAIN PRE–PETITION WAGES, SALARIES AND MEDICAL BENEFITS.

BURTON R. LIFLAND, Chief Judge.

### FACTS

The International Association of Machinists and Aerospace Workers (the "IAM") moved by Order To Show Cause requesting that an Order be entered authorizing and directing Eastern Air Lines, Inc. ("Eastern") to pay the pre-petition priority wage, salary and medical benefit claims of its IAM represented employees.

On March 9, 1989, an Order was entered granting Eastern's motion to pay certain pre-petition wage, salary, medical benefit and business expense claims of its active employees. IAM contends that neither Eastern nor this Court addressed the issue

of whether Eastern could properly pay the pre-petition claims of its active employees without paying the identical pre-petition claims of the non-active striking IAM members for wages, salaries, and medical benefits.

IAM claims that the aggregate amount of the pre-petition wage and salary claims of IAM represented employees for the February 28—March 3, 1989 period should not exceed $9,602,000, while the aggregate amount of such pre-petition claims for medical benefits should not exceed $1,000,-000.

It should be noted that the Air Line Pilots Association, International ("ALPA") supports IAM's application and asks that the relief requested by the IAM be granted as to all Eastern employees. In addition, ALPA asserts that Eastern should be ordered to pay pre-petition sick leave benefits and medical expenses to those employees on sick or disability leave. Furthermore, by Order to Show Cause, the Transport Workers Union of America, (the "TWU") also requests identical relief as to its represented employees. The TWU claims that the pre-petition wage and salary claims of TWU represented employees for the March 1—March 9, 1989 period should not exceed $5,000,000, while the aggregate amount of pre-petition claims for medical benefits should not exceed $1,000,000. The hearing date for the TWU motion has been set for March 28, 1989.

### Discussion

IAM argues that the pre-petition wage and salary claims of both Eastern's active employees and the IAM represented employees who are now on strike are priority claims under § 507(a)(3) of the Bankruptcy Code (the "Code"). IAM asserts that because all § 507(a)(3) priority claims constitute a single class, and because all such claims are essentially identical regardless of whether the claimant is presently an active employee or not, they should be treated in the same fashion. Thus, because Eastern has sought and obtained authority to pay the § 507(a)(3) claims of active employees, Eastern should be directed to pay the priority wage and salary claims of the IAM members who are not presently working for the Debtor.

■ A bankruptcy court is empowered pursuant to § 363 of the Bankruptcy Code to authorize a debtor to expend funds in the bankruptcy court's discretion outside the ordinary course of business. Section 363(b) gives the court broad flexibility in tailoring its orders to meet a wide variety of circumstances. *In re Lionel Corp.*, 722 F.2d 1063, 1069 (2d Cir.1983). However, the debtor must articulate some business justification, other than mere appeasement of major creditors, for using, selling or leasing property out of the ordinary course of business, before the court may permit such disposition under § 363(b). *Id.* at 1070; *accord, In re Continental Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986); *In re Baldwin–United Corp.*, 43 B.R. 888, 905–906 (Bankr.S.D. Ohio 1984).

In the instant case, Judge Brozman determined that Eastern had sustained its burden of articulating sound business reasons for its decision to pay pre-petition wages. Eastern stated that it was critical for it to pay such pre-petition claims in order to preserve and protect its business and ultimately reorganize, retain its currently working employees and maintain positive employee morale. (*See,* Memorandum of Law in Support of Motion for an Order Authorizing Debtor–In–Possession to Pay Wages, Salaries, and Business Expenses at 2). Although this rationale may be antithetical to IAM's position, Eastern has clearly demonstrated sound business reasons to justify such payments.

In order to effectuate the policies and provisions of the Bankruptcy Code, the Bankruptcy Court is also empowered pursuant to 11 U.S.C. § 105(a), to "[i]ssue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title."

The ability of a Bankruptcy Court to authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept. It was first articulated by the United States Supreme Court in *Mil-*

*tenberger v. Logansport, C. & S.W. R.Co.,* 106 U.S. 286, 1 S.Ct. 140, 27 L.Ed. 117 (1882) and is commonly referred to as either the "doctrine of necessity" or the "necessity of payment" rule. This rule recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay pre-petition claims where such payment is essential to the continued operation of the debtor.

> [T]he "necessity of payment" doctrine ... "[permits] immediate payment of claims of creditors where those creditors will not supply services or material essential to the conduct of the business until their pre-reorganization claims shall have been paid."

*In re Lehigh & New England Railway Company,* 657 F.2d 570, 581 (3rd Cir.1981) (quoting *In re Penn Central Transportation Co.,* 467 F.2d 100, 102 n. 1 (3rd Cir. 1972).

Further, the aforementioned railway cases were governed by the "six month rule" pursuant to the Railway Labor Act, 45 U.S.C. § 151 *et seq.,* which permits railroad debtors to pay creditors for goods delivered within six months before the filing, where the goods were necessary to keep the railroad in business. In that context, the Third Circuit stated as follows:

> Significantly, however, the *sine qua non* for the application of the "necessity of payment" doctrine is the possibility that the creditor will employ an immediate economic sanction, failing such payment. In such a circumstance, it is evident that the payment made under the "necessity of payment" rule is in the interest of all parties ... because such payment will facilitate the continued operation of the railroad. Indeed, the interruption or termination of the railroad's service can have an equally detrimental effect upon the secured creditors as upon the general creditors.

*Id.; accord, Gregg v. Metropolitan Trust Co.,* 197 U.S. 183, 25 S.Ct. 415, 49 L.Ed. 717 (1905); *In re Boston & Maine Corporation,* 634 F.2d 1359, 1382 (1st Cir.1980), *cert. denied,* 450 U.S. 982, 101 S.Ct. 1518, 67 L.Ed.2d 817 (1981); *In re New York,*

*New Haven and Hartford Railroad Company,* 278 F.Supp. 592, 602 (D.Conn.1967), *aff'd,* 405 F.2d 50 (2d Cir.1968), *cert. denied,* 394 U.S. 999, 89 S.Ct. 1592, 22 L.Ed.2d 776 (1969).

Clearly, the "necessity of payment" doctrine is applicable to the instant dispute which is related in some aspects to the Railway Labor Act. Even if this case is not directly covered by the Railway Labor Act, the doctrine would still be applicable under the rationale of Judge Learned Hand who applied this rule to a non-railroad debtor in *Dudley v. Mealey,* 147 F.2d 268 (2d Cir.1945), *cert. denied,* 325 U.S. 873, 65 S.Ct. 1415, 89 L.Ed. 1991 (1945). In that case, Judge Learned Hand held that a court was not "helpless" to apply the rule to non-railroad debtors where the alternative was a cessation of operations. Thus, the rationale for the "necessity of payment" rule, *i.e.* facilitating the continued operation and rehabilitation of the debtor in railroad reorganization cases, is also a paramount goal of Chapter 11.

In support of its contention that equality of distribution is an overriding policy, IAM states that "[i]t is a basic premise of any bankruptcy system that distribution to creditors must be equitable. That 'the theme of the Bankruptcy Act is equality of distribution is a fundamental and long recognized principle.' " (*See,* Memorandum of Law In Support of Motion at 2.) (quoting 3 *Collier on Bankruptcy* § 60.01 (14th ed. 1977)). Furthermore, IAM argues that "[i]n keeping with the general rules of equality of treatment, where the statute does not further subdivide a priority class, the court should not fix priorities *within* the class." (*See,* Memorandum of Law In Support of Motion at 4. (emphasis in original)).

■ The policy of equality among creditors as articulated by IAM may be of significance in liquidation cases under Chapter 7, however, the paramount policy and goal of Chapter 11, to which all other bankruptcy policies are subordinated, is the rehabilitation of the debtor. This policy was clearly articulated by the United States Supreme Court in *NLRB v. Bildisco & Bildis-*

*co,* 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984) which stated "[t]he fundamental purpose of reorganization is to prevent the debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources." *Id.* at 528, 104 S.Ct. at 1197. *See also, Caplin v. Marine Midland Grace Trust Co.,* 406 U.S. 416, 422–23, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972) ("In contradistinction to a bankruptcy proceeding where liquidation of a corporation and distribution of its assets is the goal, a Chapter X proceeding is for the purposes of rehabilitating the corporation and reorganizing it."). *In re Yale Express System, Inc.,* 362 F.2d 111, 116 (2d Cir.1966) ("Unlike ordinary bankruptcy, whose objective is a fair distribution of assets among creditors, this was a proceeding for reorganization which was aimed at rehabilitation, possibly with all claims ultimately paid in full").

Thus, the Bankruptcy Court's equitable power may be used to effectuate the purposes of Chapter 11, which include the "restructuring of a business' finances to enable it to operate productively, provide jobs for its employees, pay its creditors and produce a return for its stockholders." H.R.Rep. No. 595 95th Cong. 1st Sess. 16 (1977) U.S. Code Cong. & Admin. Code 1978, pp. 5787, 5963, 5977; *See, In re Johns–Manville Corp.,* 801 F.2d 60, 63–64 (2d Cir.1986) (order enjoining equity committee from pursuing action to compel shareholders' meeting might be appropriate exercise of § 105 power to protect reorganization); *In re Baldwin United Corp. Litig.,* 765 F.2d 343, 348 (2d Cir.1985) (bankruptcy court has broad equitable power under § 105 to assure the orderly conduct of the reorganization proceedings).

In the instant case, IAM concedes that "§ 105 may indeed empower the bankruptcy courts to authorize the immediate payment of pre-petition claims when essential to the survival of a debtor." (*See,* Memorandum of Law in Support of Motion at 5). IAM asserts however, "that § 105 may [not] be used as a vehicle to discriminate among priority claims when there is no compelling business need for such discrimination." *Id.* Thus, IAM maintains, that because Eastern had, as of March 9, 1989, over $200 million in cash, and is clearly able to pay the priority wage and medical benefit of its IAM represented employees it should be compelled to do so.

IAM's reliance on the distribution portions of the Code, (§§ 1122 and 1123), is misplaced. Section 1123(a) applies in the context of a plan of reorganization, and is of significance only when the debtor is ready to emerge from Chapter 11. In this case, Eastern has only been in Chapter 11 for approximately 2 weeks. Clearly, the policy considerations in issue at the "plan" stage of this Chapter 11 case may differ substantially from the issues that are before the Court today. The claims of the currently working employees and the IAM strikers *may* be similar and *may* be classified in the class pursuant to a plan of reorganization. However, this case is clearly not at that juncture. It is premature for this Court to consider the issue of equity as it has been presented by the IAM since it goes to the heart of a reorganization plan and not to which claims are necessary to be paid at this point in time to keep Eastern operating and to protect and preserve estate assets.

Furthermore, even in the context of reorganization, a majority of both cases and commentators have rejected the concept that all creditors of equal rank must receive equal treatment. Section 1123 of the Code does require the same treatment for each claim or interest of a particular class. However, it does not automatically follow that all creditors of equal rank must be treated alike. Section 1123 is only relevant in the context of § 1122 which provides, in relevant part, that a plan *may* place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interest of such class.

Cases interpreting the classification and treatment provisions of §§ 1122 and 1123 of the Code, and their predecessor provisions under the Bankruptcy Act, have held that a debtor may place claimants of the same rank in different classes and thereby provide different treatment for each re-

spective class. In *Barnes v. Whelan*, 689 F.2d 193 (D.C.Cir.1982), the Court of Appeals for the District of Columbia stated:

Section 1122(a) specifies that only claims which are "substantially similar" may be placed in the same class. It does not require that similar claims *must* be grouped together, but merely that any group created must be homogeneous. *See* 5 *Collier On Bankruptcy* ¶ 1122.03[1][b] at 1122–6 (15th ed. 1982). Although some courts have held that § 1122(a) prohibits classification based on any criterion other than legal right to the debtor's assets, the plain language of the statute contradicts such a construction.... Clearly some difference in treatment between classes is permissible, or there would be little point in creating separate classes in the first place. (citations omitted).

*Id.* at 201; *accord In re LeBlanc*, 622 F.2d 872, 879 (5th Cir.1980) ("The plan should not arbitrarily classify or discriminate against creditors.... The fact that bankruptcy courts are courts of equity, however, allows exceptions to any strict rules of classification of claims. A bankruptcy court can permit discrimination when the facts of the case justify it."); *See also, Western Mesa Oil Corp. v. Edlou Co.* 143 F.2d 843, 845 (9th Cir.1944), *cert. denied,* 323 U.S. 786, 65 S.Ct. 279, 89 L.Ed. 627 (1944). 5 *Collier on Bankruptcy,* ¶ 1122.03[b], 1122–7, 10, 18 (15th ed. 1986).

In *In re Penn Central Trans. Co.,* 452 F.2d 1107, (3d Cir.1971), *cert. denied,* 406 U.S. 944, 92 S.Ct. 2040, 32 L.Ed.2d 331 (1972), for example, the Court of Appeals for the Third Circuit held as follows:

Pro rata participation ... does not necessarily imply that all claims are entitled to simultaneous participation. To so hold would unduly impair the flexibility so essential to a reorganization proceeding.

*Id.* at 1108–09; *See also, In re Boston and Maine Corp.,* 719 F.2d 493 (1st Cir.1983), *cert. denied,* 466 U.S. 938, 104 S.Ct. 1913, 80 L.Ed.2d 461 (1984).

The principles enunciated in *Penn Central, supra,* have been embraced by the courts of this circuit. In *In re Chateau-gay,* 80 B.R. 279 (S.D.N.Y.1987), for instance, the District Court stated:

A rigid application of the priorities of § 507 would be inconsistent with the fundamental purpose of reorganization and of the Act's grant of equity powers to bankruptcy courts, which is to create a flexible mechanism that will permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately.

*Id.* at 287. *See also, In re Structurlite Plastics Corp.,* 86 B.R. 922, 931 (Bankr. S.D.Ohio 1988).

Moreover, In *In re Jewish Memorial Hospital,* 13 B.R. 417 (Bankr.S.D.N.Y. 1981), an employee benefit fund sought to compel a debtor hospital to pay post-petition contributions which constituted administrative expenses. This Court denied the application, holding that "killing the patient ... is not the solution, "and finding that "the Bankruptcy Act does not establish inexorable rules for distribution that can never be deviated from in the interest of justice and equity." *Id.* at 420.

In addition, the District Court in *In re Baptist Medical Center of New York, Inc.,* 52 B.R. 417, 426 (E.D.N.Y.1985), *aff'd,* 781 F.2d 973 (2d Cir.1986) affirmed an order of the Bankruptcy Court staying three employee benefit funds from executing upon a judgment against a debtor hospital for unpaid contributions to employee benefit plans notwithstanding that the administration expenses of certain other creditors were being paid.

■ Under the applicable case-law and the policies enunciated therein, this Court has a duty to maintain the estate for the benefit of *all* creditors. IAM has failed to demonstrate any benefit to the estate or its creditors, other than benefit to the IAM members, that would result from the payment of such wages. Paying the pre-petition wage claims of the striking IAM workers as well as workers placed on "no work status" would cost the estate in excess of $24 million with no demonstrable benefit to the value of the Debtor's estate. Although IAM asserts that as of the filing date of the Chapter 11 petition, Eastern had an

excess of $200 million in cash and thus has the ability to pay, IAM has the burden of showing that there is a necessity to pay and not merely that the Debtor has the ability to pay.

■ This is a large and complex bankruptcy case in its early triage stage. The $200 million cash reserve that Eastern stated it had as of the filing date should be used only when it is demonstrated that it is necessary and indeed critical that such funds should be expended. The $24,000,-000 that the Unions would have this Court allocate to pre-petition wage and salary payments to "non-working" employees is an amount in excess of 10% of Eastern's cash on hand. However, the Unions' main justification for such an allocation is the concept of "equity" submitted in the abstract and which is an issue that will be dealt with at the proper time in terms of distribution pursuant to a plan of reorganization or otherwise.

Therefore, IAM's request for relief for an order directing payment of certain pre-petition wage, salary and medical benefits to IAM represented striking employees is denied.

Submit an order consistent with this bench ruling.