**In re CHATEAUGAY CORPORATION, Reomar, Inc., the LTV Corporation, et al., Debtors.**

**Bankruptcy Nos. 86 B 11270 (BRL)–86 B 11334 (BRL), 86 B 11402 (BRL) and 86 B 11464 (BRL).**

United States Bankruptcy Court, S.D. New York.

July 18, 1990.

As Amended Nov. 12, 1990.

**20**

Davis Polk & Wardwell by Barbara Giuffre, New York City, for debtors.

Opperman Heins & Paquin, Charles N. Nauen, Minneapolis, Minn., for Minnesota Sportfishing, Inc.

MEMORANDUM DECISION AND ORDER ON MINNESOTA SPORTFISHING CONGRESS' MOTION FOR RELIEF FROM THE AUTOMATIC STAY

BURTON R. LIFLAND, Chief Judge.

## BACKGROUND

The moving party seeking to institute a citizen's lawsuit under the Clean Water Act brought on a motion requesting relief from the automatic stay. On July 17, 1986 (the "Filing Date") and thereafter, the LTV Corporation and sixty-six of its subsidiaries (collectively, the "Debtors"), including Erie Mining Company which was predecessor in interest to LTV Steel Mining Company (the "Mining Company"), filed for reorganization under Chapter 11 of the Bankruptcy Code (the "Code"). The Debtors were continued in the management, operation, and possession of their businesses and properties as debtors in possession pursuant to §§ 1107 and 1108 of the Code. These cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Orders of this Court.

Under 28 U.S.C. §§ 157 and 1334 and the "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York (Ward, Acting C.J.) dated July 10, 1984, this Court has jurisdiction over the Minnesota Sportfishing Congress' ("Sportfishing") motion for relief from the automatic stay. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(G).

Since 1962, the Mining Company has operated an open-pit mine, known as the Dunka Mine (the "Mine"), in St. Louis County, near the city of Babbitt, Minnesota. The principal activity at the Mine is the mining of crude taconite which is later concentrated into iron ore pellets. In order to reach the taconite, the Mining Company has to excavate and remove tons of waste rock, known as overburden, which is stockpiled on approximately 1,200 acres on the perimeter of the mining pit. Most of the stockpiling activity at the Mine took place before the filing of the petitions in these cases. The overburden contains zones of heavy metals, including copper, nickel, cobalt and zinc. These metals may leach when water—rain or subsurface or groundwater—infiltrates and percolates through the stockpiles. Water quality is affected if water discharging from the stockpiles contains elevated concentrations of heavy metals.

The effect of the mining activities on water quality is subject to the oversight by the Minnesota Pollution Control Agency (the "Agency"), a state authority. The Agency authorizes permissible levels of discharge of water pollutants and sets monitoring goals for water quality. A permit, the National Pollutant Discharge Elimination/State Disposal System Permit (the "Permit"), regulating discharges at the Mine is issued by the Agency in accordance with various provisions of the Federal Water Pollution Control Act and Minnesota statutes. The permit contains specified discharge limitations for iron, copper, nickel, cobalt, zinc, sulfate, total suspended solids, watercolor, and pH levels. The current permit was issued on November 26, 1986, after the Agency and the Mining Company entered into a stipulation agreement in

1985 to implement a long-range program for addressing environmental problems at the Mine.

The stipulation imposed three stages of environmental remediation. First, the Mining Company was required to make five specific on-site studies to address various pollution control technologies for leachate treatment. Upon Agency approval of the studies, the Mining Company was next obligated to submit plans and specifications to construct the pollution control technology. Finally, upon Agency approval of those plans, the Mining Company was required to implement the remedial actions. These projects are projected to cost between ten and twenty million dollars before completion.

The Mining Company is required to submit "Discharge Monitoring Reports" to the Agency on a quarterly basis. In August 1989, the Agency staff visited the Mine to examine the status of specified monitoring points. On December 20, 1989, the Agency issued a Notice of Violation to the Mining Company citing alleged violations at a water discharge point known as Seep 3. In response, the Mining Company, after conferring with the Agency, proceeded to implement a treatment program by constructing a holding basin for Seep 3. While the water is held in the Seep 3 basin, engineering work on water treatment facilities is progressing. Once installed, it is contemplated that these facilities will be able to treat the discharges from the mine site to environmentally acceptable levels before discharge into local waterways.

Sportfishing, a not-for-profit citizen's group incorporated under the laws of Minnesota, seeks to lift the automatic stay to initiate a lawsuit in the federal district court in Minnesota. Sportfishing issued a "Notice of Intent to Sue" on February 28, 1990, pursuant to Section 505(b) of the Clean Water Act, 33 U.S.C. § 1365(b). A mandatory sixty day period of negotiation is called for under the statute before a citizen's suit is filed. This period elapsed without resolution.

Sportfishing did not file a proof of claim for damages allegedly caused by the pre-petition stockpiling of overburden against the Mining Company or any of the other Debtors. Moreover, Sportfishing does not make any claim to damages based on pre-petition activities. An evidentiary hearing was held with respect to the issues raised by the movant in connection with its motion for stay relief.

## DISCUSSION

### I. APPLICABILITY OF THE AUTOMATIC STAY

■ The first matter to which this Court must address itself is the contention by Sportfishing that it does not really have to seek relief from the automatic stay since it is a citizen group acting as a "private attorney general" under Section 505(a) of the Clean Water Act to enforce the state's regulatory power. Therefore, Sportfishing advances the argument that its actions are excepted from the automatic stay under Code § 362(b)(4). In *In re Revere Copper and Brass, Inc.,* 29 B.R. 584, 587–88 (Bankr.S.D.N.Y.1983), *aff'd,* 32 B.R. 725 (S.D.N.Y.1983), Judge Abram interpreted the same section of the Clean Water Act and held that its provisions did not allow a private citizens group to come under the exception to the automatic stay provided under Code § 362(b)(4).

Judge Abram reasoned that:

The legislative history of Bankruptcy Code § 362(b) indicates that the exception to the automatic stay is to be interpreted narrowly.

"Section 362(b)(4) indicates that the stay under section 362(a)(1) does not apply to the commencement or continuation of an action or proceeding by a governmental unit to enforce the governmental unit's police or regulatory power. *This section is intended to be given a narrow construction in order to permit governmental units to pursue actions* to protect the public health and safety and not to apply to actions by a governmental unit to protect a pecuniary interest in property of the debtor or property of the estate." (emphasis added).

124 Cong.Rec.S. 17,409 (Oct. 6, 1978). If Congress had wanted to exempt this type of citizen suit from the ambit of the automatic stay, it could easily have done so.

*In re Revere Copper and Brass, Inc.*, 29 B.R. at 587.

This Court agrees with *In re Revere Copper and Brass, Inc.* and holds that to the extent Sportfishing relies on the Code § 362(b)(4) governmental unit exception, that section is not applicable, and therefore, it is barred by the automatic stay imposed by § 362(a) from filing suit against the Debtors.

## II. RELIEF FROM THE AUTOMATIC STAY

■ Section 362(a)(3) of the Code provides in pertinent part as follows:

(a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302 or 303 of this title ... operates as a stay, applicable to all entities, of—

(1) the commencement or continuation ... of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

\*      \*      \*      \*      \*      \*

(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;

\*      \*      \*      \*      \*      \*

(6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title.

11 U.S.C. § 362.

■ "The automatic stay prevents creditors from reaching the assets of the debtor's estate piecemeal and preserves the debtor's estate so that all creditors and their claims can be assembled in the bankruptcy court for a single organized pro-

ceeding." *In re Ionosphere Clubs, Inc.*, 105 B.R. 761, 763 (citing *In re Colin, Hochstin Co.*, 41 B.R. 322, 325 (Bankr.S.D.N.Y.1984)). "The automatic stay is intended to protect the assets of the debtor's estate from dissipation and administrative interference." *In re Johns–Manville Corp.*, 26 B.R. 420, 425 (Bankr.S.D.N.Y.1983), *aff'd*, 40 B.R. 219 (S.D.N.Y.), *rev'd in part*, 41 B.R. 926 (S.D.N.Y.1984). "The purpose of the protection provided by Chapter 11 is to give the debtor a breathing spell, an opportunity to rehabilitate its business and to enable the debtor to generate revenue." *See, In re Johns–Manville Corp.*, 801 F.2d 60, 62 (2d Cir.1986); *In re Talladega Steaks, Inc.*, 50 B.R. 42 (Bankr.N.D.Ala. 1985). The paramount policy and goal of Chapter 11, to which all other bankruptcy policies are subordinated, is the rehabilitation of the debtor. This policy was clearly articulated by the United States Supreme Court in *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984) which stated '[t]he fundamental purpose of reorganization is to prevent the debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources.' *In re Ionosphere Clubs Inc.*, 98 B.R. 174, 176–77 (Bankr.S.D. N.Y.1989) (quoting *Bildisco & Bildisco*, 465 U.S. at 528, 104 S.Ct. at 1197). *See, also, In re Ionosphere Clubs, Inc.*, 108 B.R. 901, 937 (Bankr.S.D.N.Y.1989).

The legislative history of § 362 indicates that Congress intended that the scope of the automatic stay be broad in order to effectuate its protective purposes on behalf of both debtors and creditors:

The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions. It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy.

The automatic stay also provides creditor protection. Without it, certain creditors would not be able to pursue their own

remedies against the debtor's property. Those who acted first would obtain payment of the claims in preference to and to the detriment of other creditors.... H.R.Rep. No. 595, 95th Cong., 1st Sess. 340 (1977); S.Rep. No. 989, 95th Cong.2d Sess. 54–55 (1978), *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5840–41, 5963, 6296–97.

The District Court has recently affirmed that pre-petition environmental claims, like any other claim, fit within the broad definition of "claim" set forth in the Code and are therefore dischargeable. *In re Chateaugay*, 112 B.R. 513 (S.D.N.Y.1990) ("So long as there is a pre-petition triggering event, *i.e.*, the release or threatened release of hazardous waste, the claim is dischargeable, regardless of when the claim for relief may be in all respects ripe for adjudication."). Since Sportfishing admittedly does not have a claim against the Debtors for damages caused by pre-petition actions, there is no basis to allow Sportfishing to proceed with any suit based on those pre-petition actions. Sportfishing, recognizing this at the hearing, indicated that its proposed litigating venture would be to monitor post-petition remedial activities and to enjoin or abate ongoing violations.

█ Although Sportfishing may not be barred by the automatic stay from proceeding with actions based upon post-petition activities as defined by Judge Sprizzo in *In re Chateaugay Corp.*, 112 B.R. at 513, the estates should not be forced to defend a citizen's suit when that suit is brought to enjoin or abate ongoing violations which are already being addressed by the Mining Company and the state agency charged with enforcement of the environmental laws. The state of Minnesota is no stranger to this Court having appeared here on several occasions with respect to matters involving LTV and related mining entities. The State's prior involvement included environmentally focused matters. A responsible state agency is presently active with respect to the areas of concern expressed by the movant. Thus, there is no basis to assume that the state through its various agencies and authorities are not, or will

not, be active in protecting its interests. Under the circumstances, the position of Sportfishing that the proposed suit will act as a stimulus or prod for corrective action is not supported by the facts.

The affidavit submitted by Timothy K. Scherkenbach, Director of the Agency's Division of Water Quality, is unpersuasive and concededly *does not* constitute an official position of the Agency Board. While the State, through one or more of its agencies, is aware of these proceedings, it has not appeared or taken any official position on this application. Indeed, the testimony adduced at the hearing indicates that the Agency and the Mining Company are continuing their cooperative efforts to reach a solution to the environmental problems at the Mine. It appears that Sportfishing's efforts to pressure and stimulate the Agency and the Mining Company to address the environmental issues have been successful. Under the circumstances, there has been no cause shown to permit litigation by Sportfishing where none appears necessary; where litigation costs, always expensive, will have to be borne by the estates; and where expenditures of up to 20 million dollars are already contemplated, with substantial sums already expended.

In this regard, this Court must also look to its powers pursuant to § 105(a) of the Code to expand the scope of existing automatic stay provisions in order to effectively administer the assets of the Debtors' estate. The exceptions to the automatic stay of § 362(a) which are set forth in § 362(b) are simply exceptions to the stay which protect the estate automatically at the commencement of the case and are not limitations upon the jurisdiction of the bankruptcy court or upon its power to enjoin. The power is generally based upon section 105 of the Code. The court will have ample power to enjoin actions excepted from the automatic stay which might interfere in the rehabilitative process whether in a liquidation or in a reorganization case. 2 *Collier on Bankruptcy*, ¶ 362.05 at 362–43 (15th ed. 1988)).

"Since injunctions in bankruptcy cases are authorized by statute, the usual eq-

uitable grounds for relief, such as irreparable damage, need not be shown." *In re Neuman*, 71 B.R. 567, 571 (S.D.N.Y.1987); *see, In re Chateaugay*, 93 B.R. at 29. "Instead, the bankruptcy court may 'enjoin proceedings in other courts when it is satisfied that such a proceeding would defeat or impair its jurisdiction with respect to a case before it.'" *In re Johns–Manville Corp.*, 91 B.R. 225, 228 (Bankr.S.D.N.Y.1988) (quoting *In re Chateaugay*, 93 B.R. at 29); *see also, Continental Illinois Nat. Bank & Trust Co. v. Chicago, R.I. & P.R. Co.*, 294 U.S. 648, 675, 55 S.Ct. 595, 605–06, 79 L.Ed. 1110 (1935) ("The power to issue an injunction when necessary to prevent the defeat or impairment of its jurisdiction is, therefore, inherent in a Court of Bankruptcy, as it is in a duly established Court of Equity."); *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 1008 (4th Cir.), *cert. denied*, 479 U.S. 876, 107 S.Ct. 251, 93 L.Ed.2d 177 (1986).

Since the Mining Company under the active oversight and involvement of the Agency is working to resolve the environmental problems, and currently has proposed and implemented remedial activity for correcting these problems, the proposed lawsuit constitutes an enjoinable surplus activity imposing burdens that are not offset by any discernable benefit.

In light of the foregoing discussion, Sportfishing's request for relief from the stay is denied as no cause can be shown for such relief and Sportfishing is precluded from pursuing its proposed litigation.

It is SO ORDERED.