In re DIAMOND MORTGAGE CORPORATION OF ILLINOIS, and A.J. Obie and Associates, Inc., Debtors.

Bankruptcy Nos. 86 B 13066, 86 B 13067.

United States Bankruptcy Court, N.D. Illinois, E.D.

Oct. 16, 1989.

Ronald Peterson, Catherine Steege, and Clark S. Tomashefsky, Jenner & Block, for Official Unsecured Creditors' Committee.

John W. Costello, Arvey, Hodes, Costello & Burman, Chicago, Ill., for Examiner.

Kenneth H. Denberg, Schwartz & Freeman, Chicago, Ill., for Matched Mortgage Committee.

Kenneth F. Levin, Chicago, Ill., for Miller & Chapman.

Lawrence Iser and Arthur N. Greenberg, Greenberg, Glusker, Fields, Claman & Machtinger, Los Angeles, Cal., Lowell E. Sachnoff, Sarah R. Wolff, Stuart J. Chanen, Sachnoff, Weaver & Rubenstein, Chicago, Ill., for George Hamilton.

Ronald L. Futterman, Phyllis L. Crocker, Hartunian, Futterman Howard, Chicago, Ill., for Yaffe & Co.

Daniel R. Formeller, Jacqueline A. Criswell, Tressler, Soderstrom, Maloney & Priess, Chicago, Ill., for Lloyd Bridges.

Malcolm M. Gaynor, Paula K. Jacobi, Bruce C. Dopke, Schwartz, Cooper, Kolb & Gaynor, Chicago, Ill., for debtor.

## MEMORANDUM, OPINION AND ORDER

ROBERT E. GINSBERG, Bankruptcy Judge.

### JURISDICTION AND PROCEDURE

This matter comes to be heard on the objections of the Official Unsecured Creditors Committee (Committee) appointed in these cases to the claims of George Hamilton, Lloyd Bridges, and Yaffe & Co. (claimants). This Court has jurisdiction over the proceeding under 28 U.S.C. § 1334 and the General Order of the United States District Court for the Northern District of Illinois of July 10, 1984 referring bankruptcy cases

and proceedings to this Court. This is a core proceeding under 28 U.S.C. § 157(b)(2)(B). The following constitutes the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

## FACTS

The basic facts are not disputed.[1] Diamond Mortgage Corporation of Illinois (Diamond) was an Illinois corporation and a licensed mortgage broker. Diamond was in the business of making consumer loans to homeowners. All of Diamond's loans were secured by first mortgages on the borrowers' homes. Diamond attracted its borrowers through advertisements on television, radio, and in other media. Some of these advertisements featured George Hamilton, a well known actor. Some of these ads were produced by Yaffe and Co. (Yaffe), an advertising agency. The targeted consumers were high risk borrowers who would be willing to pay Diamond's high rates of interest on their mortgages because they were not able to secure financing elsewhere. See generally Currie v. Diamond Mortgage Corp., 859 F.2d 1538 (7th Cir.1988).

Diamond had no independent source of capital and was only able to make these high risk loans by using funds that its "sales arm", A.J. Obie & Associates, Inc. of Illinois ("Obie") raised.[2] Obie, like Diamond, advertised heavily in the popular media. However, where Diamond's ads were aimed at those in financial trouble, Obie's ads were aimed at those members of the public with money to invest. Some of Obie's ads featured another well known actor, Lloyd Bridges, and some were produced by Yaffe. In general, the Obie ads promised a secure investment and a high rate of return.

The theory behind the structure of the Obie investment package was that each investment was to be matched with one or more specific Diamond mortgages in a face amount equivalent to the amount of the investment. It was the investor's understanding that an investor would give his/her money to Obie which in turn would advance the investor's money to Diamond. Diamond would then lend the funds to a borrower who would sign a note agreeing to repay the funds plus interest. The borrower would also give Diamond a mortgage interest in the borrower's home as security for the note. Diamond would transfer the note and mortgage to Obie. Obie would then assign this mortgage to the investor. When an investor was matched to one or more mortgages representing the amount of the investment, the investor became entitled to receive principal and interest payments made by Diamond's borrower. For a service fee, computed on a percentage basis, Diamond continued to service the mortgage for the investor. The notes carried a high interest rate, usually 15% or more, which in theory enabled the investor to get a generous return on his/her investment even after Diamond's service fees were taken out of the

1. No evidentiary hearing has been held with respect to any of the Committee's objections. As indicated later in this opinion, the specific facts surrounding certain of the claims and the objections thereto are clearly disputed. The objections to those claims cannot be resolved without an evidentiary hearing.

In fact, it is unclear exactly what is now pending before the court for decision. All the court has before it is the Committee's pleadings objecting to the Hamilton, Bridges, and Yaffe claim, the claimants' various joint responses to those objections, and the Committee's reply to that response. The objections give rise to a contested matter under Bankruptcy Rule 9014. Neither side has complied with Local Rule 12 with respect to summary judgment motions. Neither side has produced a statement of uncontested facts. While certain affidavits and exhibits have been supplied, it is sometimes unclear to what end. The exhibits and affidavits often clearly show that issues of material fact exist. Certain objections raised by the Committee raise questions of law. Other objections raise questions of fact. In an effort to move this litigation along, this court orders Bankruptcy Rule 7012 to apply to this proceeding pursuant to Bankruptcy Rule 9014 and will deem the pleadings before it to constitute a motion for judgment on the pleadings and resolve those of the Committee's objections that can be determined as a matter of law.

2. Obie and Diamond were separate Illinois corporations, although, as indicated in this opinion, to a certain extent they operated as a common enterprise. However, while these estates are being jointly administered, the estates have not formally been substantively consolidated.

monthly mortgage payments. The investment supposedly was secure because it was backed by a mortgage on real property.

That was the theory. Unfortunately, that was not the reality. Instead, most of the investors were never matched to mortgages, and much of the money investors placed with Obie never went to fund Diamond mortgages. Rather, in a classic Ponzi scheme fashion, much of the investors' money went toward paying off other investors or into the pockets of the principals behind the Diamond/Obie scheme, some of whom are now in jail as a result.

It is therefore not surprising that Diamond and Obie lost money from the start. By 1986, the Diamond/Obie empire began to crumble. On August 25, 1986, Diamond and Obie both filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. The investors, particularly the unmatched investors, suddenly were faced with large potential losses on their Obie investment. For many, the Obie investment represented their life savings and/or their retirement nest egg. Many investors began to look for potential defendants to sue, preferably deep pockets, in order to recover some or all of their losses. Several latched onto Hamilton, Bridges and Yaffe.

At least seven separate suits were filed by various investors against some or all of these defendants.[3] Some were brought in the district court, while others wound up in this Court. As far as these claimants are concerned, four of the suits were dismissed (*Puglisi, Abdullah, Alex, Nicholson*) and one was settled (*Ramson*). Two are pending (*Aramowicz* and *Ritter*). The claimants seek reimbursement from the estates for the attorneys' fees and costs expended for defense in the *Abdullah, Puglisi,* and *Ramson* suits. Presumably they now seek similar fees and costs for *Alex* and *Nicholson* because *Alex* had been dismissed after the briefs in this matter were filed and *Nicholson* was dismissed for want of prosecution. As far as *Aramowicz* and *Ritter* are concerned, the claimants take the position that any ruling on their claim for reimbursement and fees should be postponed until those suits are finally resolved.[4]

In addition, Yaffe has filed a large claim for advertising services allegedly rendered to those debtors and various related Diamond and Obie entities. Specifically Yaffe seeks $39,000 for services rendered to these debtors, $51,000 for services rendered to Diamond Financial Services of Indiana and $680,000 for claims it has against various other Diamond companies scattered around the United States including Diamond of Michigan.

On July 29, 1988, this Court confirmed a joint plan of reorganization for Diamond and Obie proposed by the Committee. That plan provides for an orderly liquidation of the debtors' assets, including the mortgage portfolio. Most unsecured creditors of the debtors, including the Obie investors to the extent their investments were not deemed matched to a mortgage, were made Class III creditors by the plan. However, certain unsecured claims against the debtor including "Claims of the Debtor's employees or independent contractors

---

3. *Ramson v. Layne,* 668 F.Supp. 1162 (N.D.Ill. 1987); *Diamond Mortgage Corp. v. Puglisi,* 86 A 1348; *Abdullah v. Commerce Mortgage Corp.,* 87 A 369; *Aramowicz v. Bridges,* 87 A 76; *Alex v. Bridges et al.,* 88 A 821. Since the briefs have been filed in the instant proceedings, two more lawsuits have been filed in this court against Hamilton, Bridges and Yaffe, *Ritter v. Hamilton et al,* 89 A 717 and *Nicholson v. Hamilton, et al,* 89 A 769.

4. The claimants at one point asserted that their indemnification was entitled to administrative priority. Apparently that claim has now been dropped as it is no where discussed in any of the claimants' briefs. Although there is arguably caselaw supporting the assertion of an administration claim in these circumstances, *In re*

*Frenville Co., Inc.,* 744 F.2d 332 (3rd Cir.1984) *cert. denied, Frenville Co., Inc. v. Avellino & Bienes,* 469 U.S. 1160, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985), this court does not find *Frenville* persuasive. The indemnification claims are based on alleged prepetition agreements and activities. Therefore, they are prepetition claims. *See, e.g., In re Edge,* 60 B.R. 690 (Bankr.M.D.Tenn.1986). *See also In re Remington Rand Corp.,* 836 F.2d 825 (3rd Cir.1988) (broadened the definition of pre-petition claims); *In re TM Carlton House Partners, Ltd.,* 93 B.R. 859, 868 (Bankr.E.D.Pa.1988) (the *Frenville* "holding has, to put it mildly, been questioned"; "*Frenville* has been soundly criticized as too narrow").

for indemnification" were placed in Class IV. Under the plan, Class IV creditors are to receive no payment on their claims unless and until all Class III claims are paid in full. Since it is unlikely that the liquidation of the debtors' assets will produce a dividend in excess of 40% for the Class III creditors, it is likely that Class IV creditors will receive nothing on account of their claims. None of these claimants objected to the plan and no appeal was taken from the order of confirmation.

## DISCUSSION

### I. *The Indemnity Claims*

■ The Committee takes the position that none of these claimants has a right to indemnification under applicable nonbankruptcy law; that even if such a claim exists under nonbankruptcy law, it is not allowable under § 502(e); that even if an allowable claim for indemnity exists it should be equitably subordinated under § 510(c) of the Bankruptcy Code; and that even if an allowable claim for indemnity exists in favor of any of these claimants, such a claim is a Class IV claim and effectively will be wiped out by subordination under the confirmed plan. Since the Committee's final argument is clearly correct, there is no reason to discuss any of the other objections to the indemnity claims.

The claimants argue that the indemnity claims are Class III claims. They have to make this argument to even have any hope of recovery on their indemnity claims. Unfortunately for the claimants, the language in the plan could not be clearer. Section 2.5 of the plan provides that Class IV claims "shall be ... claims of the debtors' employees or independent contractors for indemnification." The claims of employees and independent contractors for indemnity are subordinated by the plan. While the parties argued at length whether Hamilton, Bridges, and/or Yaffe were agents of Diamond and/or Obie, it is clear that all three

were independent contractors vis-a-vis these debtors.[5] It is undisputed that one person can be both an agent and an independent contractor. *Hixon v. Sherwin–Williams Co.*, 671 F.2d 1005, 1009 (7th Cir.1982). By the same token, the presence or absence of an agency relationship is irrelevant in determining whether these claimants were independent contractors. An independent contractor is defined as:

A person who contracts with another to do something for him but she is not controlled by the other nor subject to the other's right to control with respect to his physical conduct in the performance of the undertaking. He may or may not be an agent.

Restatement (Second) of Agency § 2 (1957).

Clearly all these claimants fit within this definition. They all sold the debtors various advertising services. Assuming for the sake of discussion that any of them has a claim for indemnity against one or both debtors by virtue of either contract or applicable nonbankruptcy law, and assuming such claims are allowable under the Bankruptcy Code, the indemnity claims fit squarely within the clear and unambiguous definition of Class IV claims.

The claimants advance several arguments as to why their indemnity claims should not be a Class IV claim. First, they argue that the type of indemnity claims referred to in the definition of class IV claims includes only those indemnity claims based on judgments establishing co-liability with the debtor. They argue that since such claims would be subordinated anyway to the claims of the victims in whose favor the judgment would have been rendered,[6] the definition of Class IV indemnity claims should be read to simply restate the obvious. This argument, while creative, has no evidentiary or record support whatsoever. Indeed, any logical reading of the definition

---

5. It is clear that neither Hamilton, Bridges nor Yaffe were employees of either or both debtors as the debtors had no control over their physical activities. *See* W. Seavey, Handbook of the Law of Agency § 6 (1964).

6. *See generally* 11 U.S.C. § 509.

of Class IV claims leads inevitably to the opposite conclusion.[7]

There is nothing in the plan or disclosure statement that suggests that Class IV indemnity claims were meant to be limited to claims based on judgments of any kind. The final sentence of the definition of Class IV claims makes it clear that the Class IV definition of claims does not include the indemnity claims of certain specified employees of the debtors. Those claims are further defined in Article IX of the plan which provide that the excepted employee claims for indemnity are not based on judgments. Instead, the indemnification claims of these employees are remarkably similar to the claims of Hamilton, Bridges, and Yaffe for indemnification. Since it appears that the claims of those specified employees would have been Class IV claims but for the exception carved by the last sentence of the definition, it follows that the indemnity claims asserted by Hamilton, Bridges, and Yaffe, not being specifically excepted from Class IV, are therefore included in Class IV.

The claimants next assert that the court should somehow rewrite the plan because they did not know that their indemnity claims were Class IV claims, and that had they known that those claims were instead Class IV claims they would have objected to confirmation of the plan. In this regard, the claimants seek to make much of the fact that the disclosure statement has a different definition of Class IV claims than the plan. The disclosure statement approved by the court describes Class IV claims as being "Penalty Claims, Claims filed after the bar date, claims of the Debtors' Insiders or Claims for indemnity by any person who was an employee of the Debtors." (Disclosure Statement, p. 12). The plan, on the other hand, defines Class IV claims as "claims of the debtors' em-

ployees or independent contractors for indemnification." While the discrepancy is unfortunate, it does not alter the conclusion that the claimants' indemnification claims are Class IV claims. This is true for several reasons. First, the disclosure statement's introduction tells creditors to read both the plan and the disclosure statement:

> The purpose of the Disclosure Statement is to provide creditors whose claims or interests are impaired under the Plan with adequate information to make an informed and prudent business judgment when voting on the Plan. This Disclosure Statement is not meant to take the place of the Plan. Since creditors are bound by the Plan if it is confirmed, creditors are urged to read the Plan carefully and to consult with their own attorneys about the Plan's effect on their claims.

Fourth Amended Disclosure Statement, p. 1. Had Hamilton, Bridges, or Yaffe read the plan they would have been aware of its definition of Class IV claims and its impact on their indemnity claims. In the event of a conflict between a disclosure statement and a confirmed Chapter 11 plan, the plan must, of course, control. *In re AOV Industries, Inc.*, 792 F.2d 1140, 1153 (D.C.Cir. 1986).

■ It is also important to keep in mind a very basic rule of Chapter 11 law, a rule embodied in §§ 1127 and 1144 of the Bankruptcy Code. Confirmation of a plan in effect sets the plan in stone unless the proponent chooses to alter it before it is substantially consummated. An order of confirmation can only be revoked on a complaint filed with 180 days after the order is entered and then *only* on grounds that confirmation was obtained by fraud. *See* 11 U.S.C. § 1144; *In re Longardner & Assoc., Inc.*, 855 F.2d 455 (7th Cir.1988).[8]

---

7. According to the Fourth Amended Plan of Reorganization, "Class IV Claims shall be Penalty Claims, Claims held by Insiders, Claims filed after the Bar Date and Claims of the Debtors' employees or independent contractors for indemnification. Class IV Claims do not include claims arising under the indemnities which will be given to MariAnn Kostakes, John Wallace,

Linda Moyer and Shirley Marino–Klich if the Plan is confirmed." Fourth Amended Plan, p. 7.

8. *Longardner* was decided under the version of § 1144 in effect prior to the 1984 amendments. The old § 1144 provided:

> On request of a party in interest at any time before 180 days after the date of entry of the

By the same token, Federal Rule of Civil Procedure 60(b) providing for relief from final unappealed orders on grounds of mistake, inadvertence, fraud, excusable neglect, newly discovered, or the like, has only limited application in the context of relief from final orders confirming Chapter 11 plans. *See In re A.J. Mackay Co.*, 50 B.R. 756, 758–59 (D.Utah 1985). In general, the inconsistency between the disclosure statement and the plan with respect to the definition of Class IV claims would be grounds for relief from the order confirming the Diamond/Obie plan only if the claimants can show that the inconsistency was intentional, meant to lull creditors into sleeping on their rights to oppose the plan. No such allegations of fraud have been made. No complaint was filed seeking revocation of the order of confirmation within the 180 days after confirmation. *See* 11 U.S.C. § 1144, Bankruptcy Rules 7001(5), 9023(a)(2). The court cannot now directly or indirectly revoke confirmation of the plan because of mistake or for any other reason. *See In re Newport Harbor Assoc.*, 589 F.2d 20 (1st Cir.1978).

■ Nor can the court "reform" the plan by moving the Hamilton, Bridges, and Yaffe claims from Class IV to Class III on some sort of perceived grounds of equity. This is true despite the fact that someone sent all three claimants a Class III ballot.[9] The claimants contend this act estops the Committee from asserting that the indemnity claims are Class IV claims. This argument is unpersuasive. Again, the claim-

ants have not alleged that the Class III ballot was intentionally sent to them by the debtors or Committee to defraud them by lulling them into believing that their indemnity claims would be Class III claims.

In any case, it would hardly be equitable to estop the Committee from enforcing the clear language of the plan when the claimants had it within their power to ascertain what their rights would be under the plan. All they had to do was read the plan, as that would have told them that they had a problem. Then they could have ascertained that their indemnity claims were in Class IV and presumably could have objected to confirmation.[10] The simple fact is that these claimants sat on their rights and now seek to have this Court rescue them from the consequences of their failure to act.

From a factual point of view, there is no reason to apply the doctrine of equitable estoppel to prevent the Committee from opposing Class III treatment for these indemnification claims. There simply is no evidence that any Committee member or attorney did anything to mislead these claimants. The inconsistency between the plan and disclosure statement while unfortunate, was apparently inadvertant. More importantly, it was obvious. All the claimant had to do to find it was read both documents to discover the discrepancy and explore the implications before confirmation.

order of confirmation, and after notice and a hearing, the court may revoke such order if such order was procured by fraud.

The old version of § 1144 is different from the current version which provides that the court may revoked a confirmation order *"if and only if"* the order was procured by fraud. However, even without the words "if and only if" to rely on, the *Longardner* court still held that a confirmed plan of reorganization may be revoked only if the order of confirmation was procured by fraud. *Longardner*, 855 F.2d at 460–62. For a further discussion of the 1984 changes to § 1144, *see infra* note 13.

9. Apparently only Yaffe actually voted and voted in favor of the plan. No Class IV ballots were issued apparently because Class IV was to receive nothing under the plan and thus was

deemed to have rejected the plan under 11 U.S.C. § 1126(g). In addition, apparently no creditors claimed to be Class IV creditors. This explains the observation in the court's order of confirmation to the effect that no Class IV ballots had been received. That finding was accurate in the sense that no one claiming to be a Class IV creditor filed a ballot. It was not a finding that these claimants' claims for indemnity were Class III claims.

10. This Court does not know and does not presume to say what would have happened had these claimants objected to the confirmation of the proposed plan. An evidentiary hearing would have been required to determine if these indemnity claims should have been subordinated. *In re Westgate–Calif. Corp.*, 634 F.2d 459 (9th Cir.1980).

Along the same lines, the fact the claimants were sent Class III ballots is of little significance given the clear language of the plan. As previously indicated, the Court's finding that no ballots were filed by anyone purporting to be a Class IV creditor was and is true.[11] This Court will not impose an equitable remedy like estoppel in favor of parties like these claimants who have failed to take a simple step to try to protect perceived rights. *See, e.g., Bohack Corp. v. Iowa Beef Processors, Inc.,* 715 F.2d 703 (2d Cir.1983); *In re Jartran, Inc.,* 76 B.R. 123 (Bankr.N.D.Ill.1987).

Assuming for the sake of discussion that this court could use equitable remedies to reform this plan,[12] this is not a case for it to exercise its discretion to do so. Here, it was within the claimants' power to challenge the plan and its treatment of their claims before it was confirmed, but they failed to do so. At the same time, hundreds of people who had already been victimized once were asked to vote for a plan that told them they would not have to share their meager recovery on their unfortunate investments in Diamond/Obie with the indemnification claims of these claimants. Were this court to alter that bargain as requested by these claimants, the defrauded investors' claims would be further diluted by these claimants' indemnification claims. More importantly, that altered bargain would be foisted on the investors without ever affording them a chance to vote on what would amount to a dramatically different plan than that which they were originally asked to approve or reject. Such an inequitable result cuts heavily against any discretionary exercise of equitable power by this court to rewrite the plan.

In addition, it is difficult to find authority in the Bankruptcy Code or Bankruptcy Rules for exercising such equitable powers to involuntarily rewrite an Chapter 11 plan on a request made more than 180 days after the order of confirmation was docketed. The cases are uniform in requiring any motion under Bankruptcy Rule 9024 and Rule 60(b) for relief from an order confirming a Chapter 11 plan to be made within the 180 day period of § 1144. *In re A.J. Mackay Co.,* 50 B.R. at 759; *In re Emergency Beacon Corp.,* 48 B.R. 356, 359 (S.D.N.Y. 1985) (Chapter XI plan). Thus, if the instant request for equitable relief from the order of confirmation is viewed as a Rule 60(b) motion, it is untimely.[13]

However, even were the court to conclude that Rule 60(b) relief is available to these claimants, this court would decline to

---

**11.** By the same token any comment by debtor's counsel (apparently allegedly made after confirmation) to the effect that these indemnity claims are Class III claims is without merit. The plan was the Committee's plan, not the debtor's plan. Indeed, certain aspects of the plan were hotly contested by the debtor. Thus, the Committee cannot be bound by remarks of debtor's counsel made before or after confirmation.

**12.** *In re Longardner & Assoc., Inc.,* 855 F.2d 455, 462 (7th Cir.1988).

**13.** In fact, a serious question exists as to whether Bankruptcy Rule 9024 is valid insofar as it permits Rule 60(b) relief from orders confirming Chapter 11 plans even within the 180 days after confirmation. The reason the question arises is that Rule 60(b) permits relief from a Chapter 11 confirmation order on grounds in addition to fraud—grounds such as excusable neglect and mistake. Such a result arguably flies in the face of the congressional intent found in § 1144 to the effect that an order of confirmation could be revoked only on grounds of fraud and then only on a complaint filed within 180 days after the order of confirmation is entered. That intent was made even clearer by the 1984 amendment to § 1144 providing that the confirmation order can be revoked "if *and only if*" obtained by fraud. Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. 98–353 ¶ 515. *See generally Mackay,* 50 B.R. at 759. That language would certainly seem to preclude the revocation of the order of confirmation in this case on motion under Rule 60(b) on grounds other than fraud. Thus, Bankruptcy Rule 9024 arguably conflicts with the Bankruptcy Code itself and arguably is invalid insofar as it permits relief from final orders confirming Chapter 11 plans under Rule 60(b) on grounds other than fraud. *See* 28 U.S.C. § 2075. *See also, Mackay,* 50 B.R. at 759 (confirmed plan can be revoked by the Bankruptcy Court only if the order of confirmation was fraudulently procured); *Emergency Beacon Corp.,* 48 B.R. at 359 (fraud in procuring a confirmed Chapter XI plan is the only ground for revoking the confirmation order). Fortunately, since the 180 days has long run, the court need not decide the question of the validity of Bankruptcy Rule 9024 in this contest.

grant such relief in the circumstances of the instant case. Claimants urge grounds amounting at best to mistake or excusable neglect. Relief under Rule 60(b) is discretionary. 7 Moore's Federal Practice ¶ 60.19 (2d ed. 1987). Here these claimants had a chance to read the plan and object to it but they failed to do so. In the meantime, the court approved the plan as it was submitted to the other creditors for their approval. Congress has indicated that this court's approval of that plan is not to be taken lightly. While the claimants were mistaken in their view of the plan and its impact upon them, they admit in their own pleadings that they failed to read it. Thus, on the facts, this court would decline to exercise its discretion to adversely affect the accrued rights of the other creditors in this case. 7 Moore's Federal Practice ¶ 60.19, 60.22[2].

If revocation of the order of confirmation is inappropriate, reformation of the order of confirmation is equally inappropriate here, regardless of whether it is done under the guise of either Rule 60(b) or this court's perceived equitable powers. The reason that is true is obvious. Since these claimants are asking this court to grant them relief after confirmation that they could not have gotten before confirmation, they are, in effect, asking the court to amend the plan by judicial order to provide that their claims are Class III claims rather than Class IV claims. The plan is the Committee's plan, not the court's plan. The court cannot amend a plan by judicial order. Only the plan proponent can amend the plan before confirmation, and only the plan proponent or reorganized debtor can modify the plan after confirmation and then only before substantial consummation of the plan. 11 U.S.C. § 1127. Neither the plan proponent nor the reorganized debtor has chosen to adopt the amendment the claimants propose.

While this Court may act as a court of equity, it must do so within the confines of the Bankruptcy Code. *Norwest Bank of Worthington v. Ahlers,* 485 U.S. 197, 108 S.Ct. 963, 968–69, 99 L.Ed.2d 169 (1988). This Court cannot rewrite the plan on grounds of perceived equities even if it wished to do so. The claimants cannot rewrite the plan at this late date. Only the proponent of a confirmed plan can seek to modify a plan and then only before the plan is substantially consummated. 11 U.S.C. § 1127; *In re Charterhouse, Inc.,* 84 B.R. 147 (Bankr.Minn.1988). *Contrast* 11 U.S.C. §§ 1229, 1329. While the court does not know whether this plan has been substantially consummated or not, *see* 11 U.S.C. § 1101(2), that is irrelevant. Neither the Committee nor the reorganized debtor has proposed a modification of its plan insofar as it treats these indemnification claims as Class IV claims. These claimants cannot propose a modification to redefine Class IV claims in a way that moves their indemnification claims to Class III.[14] This Court will not alter the Chapter 11 statutory pattern to permit them to force the Committee to change its plan.

In light of this Court's conclusion that the claims of Hamilton, Bridges, and Yaffe for indemnification are Class IV claims, there is no reason to determine the validity of those indemnity claims under nonbankruptcy law or the allowability of those claims under the Bankruptcy Code. It would be a waste of judicial time, for example, for this Court to conduct the extensive evidentiary hearings that would be necessary to determine if those claims should be subordinated under § 510(c) of the Bankruptcy Code. There is little likelihood that Class IV claims will ever receive any distribution under the plan. Therefore, this Court will rule that the indemnification claims asserted by Hamilton, Bridges and Yaffe are Class IV claims under the confirmed plan. The balance of the Committee's objection to the indemnity claims is denied without prejudice to renewal at such time as there is any distribution on Class IV Claims.

## II. *Yaffe's Claim for Services*

The Committee's objections to the Yaffe advertising claims stand on a completely

---

**14.** That is not to say the plan is perfect as drawn. For example, the definition of Class III claims does not say that it includes unsecured claims other than Class IV claims, although it certainly has to be read that way for the plan to make sense.

different footing than the Committee's objections to the indemnity claims. There is no doubt that Yaffe's claim is a Class III claim. The question is whether the claim should be allowed in whole or in part, disallowed in whole or in part, and whether it should be subordinated. As previously indicated, the Yaffe advertising claim breaks down into three parts: $39,000 for services rendered directly to the debtors, $51,000 for services rendered to Diamond of Indiana, and $680,000 for services rendered to other Diamond entities scattered across the county, including the bankrupt Michigan corporations.

■ As to Yaffe's claim for services rendered to the debtors, the Committee does not seem to object to the merits of the claim. Instead, the Committee takes the position that this and all other claims of Yaffe should be equitably subordinated to the claims of Class III creditors because of Yaffe's participation in the fraudulent and misleading advertising campaign that enabled the debtors to perpetrate their Ponzi scheme on an unsuspecting public.

Suffice it to say that basic due process considerations require that Yaffe be afforded a hearing on the subordination of its claims. At the outset, it is worth noting that any attempt to subordinate Yaffe's claims outside of the plan context requires an adversary proceeding. *See* Bankruptcy Rule 7001(8). *See also* Bankruptcy Rule 3007. However, sliding over that problem, equitable subordination generally requires a showing of wrongdoing on the part of the creditor whose claim is to be subordinated to the detriment of other creditors of the debtor. *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939). In other contexts, e.g. *Aramowicz,* Yaffe vigorously contests such wrongdoing. Therefore, to subordinate Yaffe's claims, the Committee will have to file a complaint and prove its case. It has not yet done that and the court cannot rule on the subordination request in any way at this time other than to deny it for failure to file an adversary proceeding.

As to the Diamond of Indiana claim, the Committee contends that each corporation in the Diamond/Obie empire was solely liable for its own debts and therefore Diamond of Illinois has no liability for the obligation of Diamond of Indiana. Yaffe contends that Diamond of Illinois agreed to pay the advertising expenses of Diamond of Indiana. The Committee counters by saying that if there was such an agreement, it was not in writing as required by the Statute of Frauds and it would amount to a fraudulent conveyance as Diamond of Illinois would not get reasonably equivalent value from payment of Diamond of Indiana's debts.

Clearly the Committee has raised grounds, which, if proved, could lead to the disallowance of Yaffe's claim for services rendered to Diamond of Indiana. However, those grounds have yet to be proved by the Committee. An evidentiary hearing will have to be held to determine whether an agreement existed, if so what it was, whether the Statute of Frauds applies, and what value, if any, Diamond of Illinois received from agreeing to pay the debts of Diamond of Indiana debts.

Yaffe's largest claim by far is the claim that these debtors should be liable for all of the money owed it by all of the other entities (including Diamond of Indiana) in the Diamond/Obie national empire. The claim is based on an alter ego theory, i.e., that all the corporations in the empire were run by their common principals as one, and that all were underfunded or that corporate norms were not followed and that therefore the corporate veil of all the corporations in the empire should be pierced and all the corporations treated as a single entity. The Committee is appalled by this possibility because in its view it could open the floodgates to other creditors filing such claims and deplete the dividend to investors in this case by as much as 75%.

The Committee's first argument is that Yaffe's failure to raise the alter ego claim at the plan stage estops it from doing so now. This argument is without merit. Yaffe's alter ego claim was already on file during the plan process. The failure of the Committee to find it or deal with it then is not Yaffe's problem. It was not Yaffe's

duty to raise questions of feasibility and adequacy of disclosure. Those are the plan proponent's problems. It was up to the Committee to examine the claims on file during the plan approval process to determine the adequacy of its disclosure and the feasibility of its plan. Its failure to do so cannot result in a creditor like Yaffe losing its right to assert its claim.[15]

The Committee also takes the position that the Yaffe alter ego claim should be denied because to allow it would work an inequity on the other creditors. While it is unclear how far the equitable powers of the court go to disallow a claim on equitable grounds,[16] such a determination could only be made after an evidentiary hearing.

■ Finally, the Committee asserts that Yaffe lacks standing to assert an alter ego claim in this court. As the Committee sees it, the right to assert that claim belongs to the trustee for the Michigan entities which are involved in their own Chapter 7 cases in the Eastern District of Michigan. In as far as Yaffe's alter ego claim seeks to assert claims that Yaffe has against the Michigan debtors in these cases, the Committee is absolutely correct. Yaffe lacks standing to assert those claims.

The law in this circuit is defined by *Koch Refining v. Farmers Union Central Exchange, Inc.*, 831 F.2d 1339 (7th Cir.1987), *cert. denied*, 485 U.S. 906, 108 S.Ct. 1077, 99 L.Ed.2d 237 (1988). In that case, the Seventh Circuit held that the trustee of a corporate debtor has standing under Illinois law and bankruptcy law to pursue alter ego actions to pierce the veil of a corporate debtor. *See also In re S.I. Acquisition, Inc. v. Eastway Delivery Ser-*

*vice, Inc.*, 817 F.2d 1142 (5th Cir.1987); *but see In re Ozark Restaurant Equipment Co.*, 816 F.2d 1222, 1228 (8th Cir.1987), *cert. denied*, 484 U.S. 848, 108 S.Ct. 147, 98 L.Ed.2d 102 (1987); *Barnett v. Stern*, 93 B.R. 962 (N.D.Ill.1988) (a trustee has no power under § 544 to assert an alter ego claim on behalf of the bankrupt estate's creditors). The trustee is the representative of the estate. 11 U.S.C. § 323. The Michigan trustee alone has standing to assert the alter ego action on behalf of the Michigan estate. Where the trustee has standing to pursue an action on behalf of the estate, no creditor can pursue that action on its own behalf, at least without the prior permission of the Michigan bankruptcy court. Otherwise Yaffe will get an advantage over its fellow Michigan creditors in asserting a claim that belongs not to Yaffe alone, but to all the Michigan creditors collectively. Therefore, the Yaffe alter ego claim will be dismissed effective 30 days from the entry of this order to allow the Michigan bankruptcy court and trustee to determine whether to pursue the matter.[17]

## CONCLUSION

IT IS HEREBY ORDERED that the indemnity claims of Hamilton, Bridges, and Yaffe are allowed as Class IV claims. However, said claims are allowed without prejudice to the Committee's right to object to the allowance of those claims, when and if it appears that there will be a distribution to Class IV claims.

IT IS FURTHER ORDERED that a prehearing conference is set on the Committee's objections to Yaffe's claims for Advertising Services for Tuesday, November

---

**15.** By the same token, the order of confirmation is not res judicata with respect to objections as far as this claim is concerned. Nothing in the plan or order of confirmation purports to deal with Yaffe's advertising claim. Therefore the merits of the advertising claim have not been judicially determined. Certainly, nothing in the plan gives Yaffe any notice that its alter ego claim is to be disallowed by the order of confirmation. Due process requires that Yaffe have notice and an opportunity to be heard before its alter ego claim can be judicially determined. *See, e.g., Sniadach v. Family Finance Corp.*, 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969);

*cf. DeBoer Construction, Inc. v. Reliance Insurance Co.*, 540 F.2d 486 (10th Cir.1976), *cert. denied*, 429 U.S. 1041, 97 S.Ct. 741, 50 L.Ed.2d 753 (1977).

**16.** *See Ahlers, supra.*

**17.** The Committee argues that the Michigan trustee has already waived the alter ego claim. This court is not now required to determine the existence of any waiver or its validity vis-a-vis Yaffe.

14, 1989 at 9:00 a.m. in conjunction with the pretrial conference in 89 A 257, the Committee's preference action against Yaffe.